OPINION OF THE COURT
Myriam J. Altman, J.
Jury selection in this homicide prosecution was completed on November 14, 1983, with testimony scheduled to commence the following morning. Later that day the key prosecution witness, Bobby Edmonds, was murdered. The People consequently seek the admission of Mr. Edmonds’ Grand Jury testimony. The defendant contends that such admission would deprive him of his Sixth Amendment right of confrontation.
The Sixth Amendment of the Constitution of the United States provides that, in a criminal trial, a defendant has the right to confront the witnesses against him. The Grand Jury testimony of an unavailable prosecution witness is accordingly inadmissible at trial because the defendant is precluded from cross-examining that witness with respect to his or her testimony. The right to cross-examine, which is implicit in the right of confrontation, is, of course, an important tool with which to test the reliability of evidence (United States v Thevis, 665 F2d 616, cert den sub nom. Evans v United States, 456 US 1008).
*387 Recent decisions of both Federal and State courts have held that under certain circumstances a defendant may, by his own misconduct, waive his right to confront witnesses. Such a waiver is based upon the policy consideration that the law will not permit a person to take advantage of his or her own wrongdoing (United States v Mastrangelo, 693 F2d 269, 272). “Thus, if a witness’ silence is procured by the defendant himself, whether by chicanery * * * by threats * * * or by actual violence or murder * * * the defendant cannot then assert his confrontation clause rights in order to prevent prior grand jury testimony of that witness from being admitted against him. Any other result would mock the very system of justice the confrontation clause was designed to protect” (United States v Mastrangelo, supra, pp 272-273). A defendant who engages in such misconduct is aware that the witness will consequently be unavailable for cross-examination and has intelligently and knowingly waived the right of confrontation, as well as any objection to the hearsay nature of the testimony (United States v Thevis, supra; Matter of Holtzman v Hellenbrand, 92 AD2d 405). Thus, here, if the defendant was involved in the murder of the witness “through knowledge, complicity, planning or in any other way,” he has waived his objections to the admissibility of the Grand Jury testimony (see United States v Mastrangelo, supra, p 273).
With regard to a prosecution claim of a waiver of the right of confrontation, an evidentiary hearing should be held when “the People allege specific facts which demonstrate a ‘distinct possibility’ * * * that a criminal defendant’s misconduct has induced a witness’ unlawful refusal to testify at trial or has caused the witness’ disappearance or demise” (Matter of Holtzman v Hellenbrand, supra, p 415). Here, as a result of a showing by the People of a factual basis which distinctly suggested that the defendant had been involved in the death of the witness, I held an extended evidentiary hearing. At that hearing hearsay evidence was received. In this regard I analogized the proceeding to a suppression hearing as the question to be determined is the ultimate admissibility of evidence at trial (see GPL 710.60, subd 4; United States v Mastrangelo, supra; see, also, Fed Rules Evid [in US Code, tit 28, Appendix], rule 104, subd [a]).
*388 As to the burden of proof at the hearing, the cases are uniform only in rejecting “reasonable doubt” as the proper standard. In Mastrangelo (supra) the Second Circuit applied the “preponderance of the evidence” test, while the Fifth Circuit (United States v Thevis, supra) and the Appellate Division, Second Department (Matter of Holtzman v Hellenbrand, supra), suggest that it is the “clear and convincing” standard which should apply.
Under the circumstances of this case, I find that the clear and convincing test is the appropriate standard to be applied at this hearing. The reliability of testimony goes to the very heart of the fact-finding process, particularly here, where the proffered evidence will probably constitute the entirety of that portion of the prosecution’s case which connects the defendant to the murder. Consequently, the People must prove, by clear and convincing evidence, that the defendant was involved, in some substantial manner, in the murder of the witness.
At approximately 7:15 p.m. on November 14, 1983, Bobby Edmonds was murdered at 308 West 121st Street in New York County. The place where the murder occurred was a narcotics “shooting gallery” and was known as such by October, 1982.[1] Edmonds first came to the attention of the police as a potential witness on October 19,1982 when he came to the 28th Precinct to file an assault complaint. While there he spoke to Detective Mulcahy. Edmonds’ hands and feet were swollen, he had visibly infected sores on his arms and exuded an odor of decaying flesh. The odor was so foul that Mulcahy kept the door open while speaking to him.
Edmonds had a bloodied face and stated that a person named Nookie and another male had taken him out of a “shooting gallery”, said words to the effect of “we hear you’ve been talking” and hit him with a brick. He then made a statement to the detective relating that on October 15, 1982 he had seen Nookie and two other men shoot McKinley Freeman, Jr., at 117th Street and Eighth Avenue. Mulcahy’s offer to drive around to look for the men *389 who assaulted Edmonds was declined and instead Edmonds asked that he be taken to the hospital. He promised to return and gave his address as 2166 Eighth Avenue.
Detective Bratton, who had been assigned to the Freeman homicide, was not informed of Edmonds’ statement until he reported to work on October 21, 1982. However, Bratton was unable to locate Edmonds until February 2, 1983. At that time Edmonds was shown a photo array which included photographs of the defendant and two of his brothers. He positively identified the defendant, Nathaniel Sweeper, as Nookie. Bratton had previously focused on the defendant as a suspect by looking through a file which contained nicknames of certain known criminals. Edmonds had known the defendant for eight or nine years, having worked for him for much of that time as a steerer for drugs. Edmonds indicated his willingness to testify in the Freeman homicide case but sought certain assurances as to his safety after the trial. He requested a ticket to Baltimore, where he had family. Bratton promised him such a ticket.
The defendant was arrested for the Freeman homicide on April 8, 1983 and was arraigned that same day. On April 14 Edmonds was brought to the office of Assistant District Attorney (ADA) Saracco, where he was prepared for the Grand Jury testimony which he gave later that day. Edmonds’ hands and feet were swollen, he had visible sores on his body and, according to ADA Saracco, smelled like a walking corpse. Edmonds told Saracco about the defendant’s assault on him on October 19, 1982 and then detailed the facts surrounding the Freeman homicide. When ADA Saracco told Edmonds that he was willing to seek an indictment of Sweeper for the assault as well as for the homicide, Edmonds begged him not to do so, because he did not want his name to appear on the indictment thereby alerting Sweeper that he, Edmonds, was a witness in the homicide case. Saracco acceded to Edmonds’ wishes.
After his testimony before the Grand Jury, Edmonds returned to the world of drugs, of which he was a habitue. From time to time he would go to the 28th Precinct to look for Bratton to obtain money for food. Bratton gave him $3 to $5 on several of the 10 to 15 separate occasions that Edmonds visited the precinct.
*390 This case reached the Trial Part on November 7,1983, at which time defense counsel renewed his request for the names and addresses of the two remaining witnesses whose names had not yet been released.[2] After an in camera submission by Mr. Saracco, the request was denied and the case was continued to November 10, 1983 for jury selection. On that date defense counsel’s request was again denied, but I advised the Assistant District Attorney that I would require him to reveal the names prior to the opening statements. On November 14, at approximately noon, all relevant Rosario material, including Edmonds’ name, present address, Grand Jury testimony, prior statements and complete criminal record, was turned over to the defense in anticipation of opening statements and the commencement of testimony later that afternoon. In fact, the commencement of opening statements was continued until November 15, 1983.
On November 9,1983, on information that Edmonds was staying at a “shooting gallery” located at 308 West 121st Street, Bratton proceeded co that location to speak to him. Edmonds stated that he was in bad shape and wanted to go to a hospital. Bratton took him to the Sydenham Clinic at 125th Street and then to Harlem Hospital. Assuming that Edmonds would be admitted, Bratton left him in the emergency room. On the next day Bratton learned that Edmonds had not in fact been admitted to the hospital.
Bratton next attempted to locate Edmonds on November 14, 1983. He went to the “shooting gallery” at 308 West 121st Street at about 9:15 a.m., spoke to Edmonds and told him he wanted to take him to ADA Saracco’s office. Edmonds refused, saying that he was in bad shape and could not go anywhere, but stated that he would be at the gallery all day and would be “straight tomorrow”, the day he was scheduled to testify. Edmonds appeared to be “out of it”, needed a fix, had a little perspiration on his face, was drooping and walking very slowly. He had sores on his body and exuded that same foul odor. However he was not “nodding out” and appeared to understand what was said to him. He gave no indication that he would leave the *391 “shooting gallery” or refuse to go to court and did not request protective custody. Bratton then proceeded to the office of the District Attorney.
During the luncheon recess on November 14, ADA Saracco informed Bratton that the names of the remaining witnesses had been turned over to the defense. Bratton and Saracco then discussed, apparently for the first time, what arrangements could be made for Edmonds’ safety. Bratton dismissed suggestions that a patrol car be sent to the area of 308 West 121st Street, or that Edmonds be arrested on a drug charge. Instead no steps whatever were taken to safeguard Edmonds. Indeed Edmonds was never told that his identity would be revealed or that it had been revealed to the defense. It was not until November 15, 1983, when he checked into the 32nd Precinct where he is currently assigned, that Bratton became aware that Edmonds had been killed the previous evening.
A criminal organization known as the Vigilantes has been active in Harlem in the vicinity of 110th Street to 121st Street from the west side of Eighth Avenue to Morningside Avenue since 1975. Its headquarters are located at 392 Manhattan Avenue. The existence of this organization was established at the hearing by the entirely credible testimony of both Walter Anderson, a former Vigilante trainee, and Detective Donovan, a member of a task force which is currently investigating the Vigilantes and an expert on the operation of that organization (cf. People v Siu Wah Tse, 91 AD2d 350).
The organization sells heroin stamped with the brand name Vigilante and also commits narcotics-related homicides. Its structure is hierarchical with approximately 40 ranking members and a group of trainees known as Golden Hatchets. The Vigilante uniform consists of military fatigues, including bulletproof flack jackets. The leader of the Vigilantes is one William Underwood.
The defendant and several of his brothers are ranking members of the Vigilantes. Fifteen homicide investigations in which Vigilante members are suspects are presently in progress. Eight known Vigilantes are under indictment for murder, including the defendant. The organization has a policy, known to its members as well as others, *392 called “process elimination”. That policy is to kill potential witnesses who co-operate with the police against them. As an active and high-ranking Vigilante, the defendant was aware of this policy.
At about 7:00 p.m. on November 14,1983, two men, one a known Vigilante, approached the premises at 308 West 121st Street. The Vigilante remained outside the building. The other man entered the building and was seen shooting Edmonds behind the ear in a second floor corridor. No one saw the killer, unidentified to date, go through Edmonds’ pockets or in any other way take anything from his person. In fact Edmonds’ pockets were in place, although no property of value was discovered on his body. This is consistent with testimony that Edmonds was never seen wearing any kind of jewelry and had sought money from Bratton on a number of occasions because of his destitute status.
Richardine Scipio, Nathaniel Walker and Jerome Sweeper were also called as witnesses at the hearing. I find that their testimony was not credible and, accordingly, I reject it.
An analysis of the credible evidence indicates that the defendant had the opportunity, motive and intent to prevent Bobby Edmonds from testifying. I find that as early as October 19, 1982, the defendant was aware that Edmonds had been a witness to the homicide and tried to silence him by assaulting him. Even within the drug scene Edmonds was a distinctive individual. His massively swollen hands and feet were not uncommon to heavy drug-users. However, he additionally had extensive sores on his body on October 19, 1982 and continued to have those sores at the time of his murder. Further, the foul odor that exuded from his body was more intense than that emanating from the ordinary unwashed derelict.
During jury selection on November 10, 1983, the Assistant District Attorney continually informed the potential jurors that a prosecution witness was a “junkie” with a criminal record and then made the following statement: “You may hear that the witness who comes before you is a heroin addict right now, who may be on the stand with sores on him, with an odor that is foul. Might find out that he has a criminal record. He may be the only witness we *393 produce.” At that point, the defendant knew that the witness against him was Bobby Edmonds. Thus, the release of Edmonds’ name on November 14 only confirmed what the defendant already knew. Although the defendant had no access to a telephone on November 14, he had ample access to telephones at his place of incarceration between November 10 and November 14, with the opportunity to inform his fellow Vigilantes, who had a policy of killing potential witnesses. He knew that the name would be released prior to jury selection and could plan accordingly. If the police knew on November 9 that Edmonds was staying at 308 West 121st Street, clearly that fact must have been common knowledge in the drug world centered in the community. Edmonds could not be anywhere unnoticed and could easily be found by those interested in finding him. Thus, the defendant had ample opportunity to contact his people to finalize plans for the elimination of the witness.
Sweeper’s motive to harm Edmonds was clear and indeed he had already committed a crime against Edmonds in pursuit of that motive. The defendant was the only one who had anything to gain from the murder of a destitute and dying heroin addict. The earlier assault committed against Edmonds is indicative of the defendant’s intent to prevent Edmonds from co-operating with the authorities and his willingness to use violent means to do so.
Finally, the timing and manner of Edmonds’ death is strong and persuasive evidence of defendant’s involvement. The murder of a key witness on the eve of trial is “tangible evidence” of misconduct on the part of the defendant (United States v Mastrangelo, supra, p 273). Given the type of person that Bobby Edmonds was — a poor heroin addict with no known enemies — the timing of his death could be no mere coincidence. The killing of Edmonds was clearly an execution and the person who brought the shooter to the scene was a member of the defendant’s organization, the Vigilantes. Edmonds was not robbed, nor was there evidence of any other motive for the murder.
In view of the defendant’s prior knowledge, motive, previous malevolent conduct and opportunity to put his nefarious plans in motion, I find, by clear and convincing *394 evidence, that the defendant was involved in the homicide of Edmonds and that the murder was committed by individuals acting on his behalf (see United States v Papadakis, 572 F Supp 1518, Weinfeld, J.; United States v Mastrangelo, 561 F Supp 1114, affd 722 F2d 13). Under these circumstances the defendant has waived his right to confront the witness because his own misconduct has made the witness unavailable for trial. In addition, the defendant has waived his right to object to the hearsay nature of the testimony (United States v Thevis, 665 F2d 616, supra).
Further, I note that the proffered Grand Jury testimony has sufficient indicia of reliability to permit its admission at trial although it is hearsay (United States v Thevis, supra). Edmonds’ testimony before the Grand Jury was given under oath. From as early as October 19, 1982 Edmonds knew that he was in danger and he expressed his fear to Detective Bratton on February 2 and again to ADA Saracco on April 14, 1983. He nevertheless consented to testify and sought only a ticket to Baltimore and an assurance that his name would not appear in the indictment. Other than his drug habit, Edmonds was obviously a man of the most minimal of needs who resorted to asking for modest handouts of money for food. He had no motive to fabricate a story against the defendant which would put his life in danger. Despite well-founded fears, Edmonds gave a lucid narrative about the homicide of Freeman without any promises except a ticket to Baltimore and a few dollars for food. I find the testimony reliable and admissible at trial.

. On consent of both counsel at the hearing I took judicial notice of the status of the location in Oct., 1982 as that fact had been adduced at a trial held before me in June, 1983.

. The other potential witness was no longer of value to the People as he had apparently changed his story.