OPINION OF THE COURT
Marcy L. Kahn, J.
Defendant Richard Cotto stands charged with murder in the second degree and related crimes in connection with the shooting death on November 28, 1992 of Steven Davilla. This decision resolves the issues raised at the Sirois[1] hearing held mid-trial on March 21, 22 and 25, 1996.
BACKGROUND
The People’s sole living eyewitness to the crime,[2] Anthony Echevarria, had informed the prosecution on more than one occasion prior to the trial that he was present at the time the fatal wound was inflicted and that he observed the defendant inflict it. On Sunday, March 17, 1996, the day before he was scheduled to come to court to testify in the case, Echevarria telephoned the lead prosecutor on the case, Assistant District Attorney (ADA) Emilio Estela, from Rikers Island where he was incarcerated on an unrelated charge and left a voicemail message for Estela to "forget it”, that Echevarria was "not saying nothing”, that his family was "in jeopardy”, and that "everything is off, I’m not doing nothing. You put me on the stand, do whatever you got to do but I don’t know nothing. I didn’t see nothing * * * Forget everything”.
The following morning the prosecutors interviewed Echevarria and then sought and were granted an ex parte conference with the court, at which time they informed the court of the telephone messages Echevarria had left the day before. ADA Estela also stated that Echevarria had informed them that he feared for his family’s safety. He stated that apparently sometime between his last conversation with them the previous Thursday and his Sunday morning telephone call to them, *196 his mother and wife had been approached by unnamed individuals who told them that there was a contract out on him, and who demanded to know whether Echevarria was going to testify in the case.
The People declined the court’s offer of a postponement of Echevarria’s testimony and made no specific application to the court. Echevarria was called to the stand and, while describing the events leading up to the shooting in detail, including the movement of the gunman crossing the street in front of him just prior to the shooting, testified without equivocation that he did not see the person who did the shooting. After a sidebar conference, the court removed the jury from the courtroom, whereupon the witness asked to address the court. He then stated:
"Spanish Harlem is a small place, okay. My family lives there. All right. I don’t live there. Okay.
"Steven was a friend of mine, a good friend of mine. All right.
"Now, see, I got to think about my family, all right. Even though I’m not going to live there, my family is going to be there, you know what I’m saying.
"And —” (transcript, at 192).
At this point, the witness was interrupted by the court and excused from the courtroom.
Thereafter, the People moved to introduce the witness’ out-of-court statements in which he had identified Cotto as the shooter as evidence-in-chief. They also moved in limine to introduce evidence of the threats allegedly made to Echevarria’s relatives as circumstantial evidence of defendant’s consciousness of guilt.
LEGAL DISCUSSION
Whenever the People allege specific facts demonstrating a "distinct possibility” that the defendant’s misconduct has rendered a witness unavailable to testify, either through an unlawful refusal to testify, or by causing the witness’ demise or disappearance, the court must grant a Sirois hearing to test the validity of the People’s claim. (Matter of Holtzman v Hellenbrand, 92 AD2d 405, 415 [2d Dept 1983], supra.) Our Court of Appeals has recognized the common-law hearsay exception announced by the Second Circuit in United States v Mastrangelo (693 F2d 269 [2d Cir 1982], cert denied 467 US 1204 [1984]), and long followed by the Federal courts and lower *197 courts of this State (see, e.g., Rice v Marshall, 709 F2d 1100 [6th Cir 1983], cert denied 465 US 1034 [1984]; United States v Thevis, 665 F2d 616 [5th Cir 1982], cert denied 459 US 825 [1982]; People v La Torres, 186 AD2d 479 [1st Dept 1992], lv denied 81 NY2d 1015 [1993]; People v Trice, 167 AD2d 899 [4th Dept 1990], lv denied 78 NY2d 1082 [1991]; Matter of Holtzman v Hellenbrand, supra), which permits "out-of-court statements, including Grand Jury testimony, [to] be admitted as direct evidence where the witness is unavailable to testify at trial and the proof establishes that the witness’s unavailability was procured by misconduct on the part of the defendant”. (People v Geraci, 85 NY2d 359, 366 [1995]; see, People v Hamilton, 70 NY2d 987 [1988].)
Under New York law, this exception to the hearsay rule emanates not from statutory sources (cf., CPL 670.10),[3] but from the venerable common-law concept of forfeiture by misconduct, i.e., that one not be permitted to profit from one’s own wrongdoing (People v Geraci, supra, at 366; see, Reynolds v United States, 98 US 145, 158 [1878]), as well as from the well-established public policy of eliminating the incentive to tamper with witnesses. (People v Geraci, supra, at 366, 367-368.) These public policy goals are so strong, the Court of Appeals has stated, that the Sirois exception finds its justification in the service of these goals, notwithstanding the inherent unreliability of the hearsay evidence sought to be introduced. (Supra, at 367-368.)[4]
Nonetheless, in part because of such unreliability, the standard of proof required as a precondition of admission of such evidence is one of clear and convincing proof that the defendant’s misconduct caused the unavailability of the witness. (Supra.) At the same time, owing to the difficulties inhering in establishing that a witness’s unavailability was procured by the defendant, hearsay is admissible and the People may rely *198 in whole or in part on circumstantial evidence to meet their foundational burden at the hearing. (Supra, at 369.) Once met, however, the hearsay statement is admitted and the defendant loses the right to cross-examine about the substance of the statement for all purposes. (Supra, at 367; see, United States v Aguiar, 975 F2d 45, 47 [2d Cir 1992], supra ["A defendant who procures a witness’s absence waives the right of confrontation for all purposes with regard to that witness”].)

Findings of Fact

At the Sirois hearing, the People called the following witnesses: Police Officer Wilson Vargas, of PSA 5; Anthony Echevarria; Detective Hedxan Quinones, of the 23rd Precinct Detective Squad; Miriam Echevarria, Anthony’s mother; and Opelita Echevarria, Anthony’s sister. In addition, the People introduced an audiotape recording of the two messages left by Anthony Echevarria on ADA Estela’s voicemail on March 17. Upon review of all of the evidence presented, I credit the testimony of Vargas, Quinones and Miriam Echevarria as being consistent with both the objective evidence and the commonsense inferences which arise from it, and thoroughly consistent with one another’s testimony in every essential detail.
To the extent it conflicts with the testimony offered by these witnesses, I do not credit the testimony of Anthony Echevarria. His testimony at this hearing was belied by his own tape recorded messages to ADA Estela, was internally contradictory and was at odds with the commonsense inferences which flow from the facts as he described them, including the fact that he could see that it was the individual with the blue pants who came over to the east side of the street. His testimony was also in direct contradiction of the police witnesses, who were not arresting officers in this case, were assigned to different commands and were not shown to have any motive to fabricate. Moreover, during his testimony both on March 18 and again at the Sirois hearing, Echevarria appeared to be anxious, uncomfortable and forced in his responses, a demeanor inconsistent with truthfulness and consistent with a state of mind demonstrating a fear of harm to his family or to himself if he should testify against Richard Cotto. Neither do I find the testimony of Opelita Echevarria credible, as it conflicts with the accounts of both her mother and Detective Quinones and is inconsistent with the actions and out-of-court statements of her brother.
The relevant, credible evidence adduced at the hearing established that on March 13 and 14, 1996, Anthony Echevar *199 ria was brought to ADA Estela’s office at One Hogan Place in preparation for his trial testimony. On each occasion, Estela and Echevarria were joined by Officers Vargas, Rogers and Anderson and Detective Quinones. ADA Campos entered and left the room at various points. Echevarria was seated in a chair and was not in handcuffs during each of these one to one and one-half hour interview sessions. On the 13th, Estela confronted Echevarria with the written statement he had made shortly after the murder and asked him why the statement did not include the name of the perpetrator. Echevarria responded that at the time he was scared. This statement finds support in the fact that when he was questioned at the scene of the crime, Echevarria gave a false name, something he had never done when he had been arrested in the past, and which he did despite the fact that he did not believe that he was a suspect in the shooting.
At both interviews, Echevarria described the events he had witnessed on November 28, 1992 in great detail, describing how while he was at the telephone on the corner, he saw Cotto come across Second Avenue in a crouched manner, holding his hand close to his side. When Cotto reached the east side of Second Avenue north of the corner of 103rd Street where Echevarria was using the telephone, he approached Steve Davilla, said, "What’s up now, money?” and pointed a gun at Davilla and shot him. Echevarria described how Davilla fell backward, stumbling, and Cotto pursued him to the corner, continuing to shoot in his direction. Davilla ran toward First Avenue, at which time Cotto, having followed Davilla as far as the corner of 103rd Street and Second Avenue, turned around, made eye contact with Echevarria and pointed the gun at him. Echevarria reported that a second individual was across the street at the Washington Houses, also firing a gun. Cotto ran across Second Avenue and both he and the second shooter ran toward the park on 103rd Street. Echevarria then ran east on 103rd Street to check on Davilla.
This detailed report was repeated at both interviews. During each interview, Echevarria’s attitude and frame of mind seemed positive, and he engaged in conversation with those present without showing any signs of discomfort. At no time did any of those present yell at Echevarria or promise him anything. When he was hungry, food was provided to him.
On March 15 the prosecution announced in its opening statement that Anthony Echevarria would testify to having seen Richard Cotto fatally shoot Steven Davilla. Sometime between *200 Echevarria’s second interview with the police on March 14 and the morning of March 17, Opelita Echevarria was approached by one or more persons who asked her where at Rikers Island her brother was housed. Although the identity of these persons was not revealed at the hearing, I credit Detective Quinones’ report that Opelita Echevarria told him on March 20 that they were people she knew from the neighborhood, and that the inquiry was made of her while she was standing on 102nd Street between First and Second Avenues, the block on which the defendant and his family live. I also credit Quinones’ testimony that Opelita Echevarria told him that the word on the street was that Anthony was "talking” and people on that block knew that Anthony had been to the District Attorney’s office in connection with this case. During that interview held at the 23rd Precinct, Opelita Echevarria repeatedly told Quinones that Richard Cotto and his family are "dangerous”, and that "[i]f you testify against them, you know, they’ll kill you”. Quinones also reported that during the 14 years he has spent as a detective in the 23rd Precinct, he has come to know that Richard Cotto’s reputation in the neighborhood is that anyone who speaks out against him or his brother risks getting hurt. Quinones had arrested Cotto and his brother for shooting someone in 1985.
The evidence also establishes that prior to the morning of March 17, Opelita Echevarria told her mother that someone had stopped her in the street with her baby and had asked whether her brother was incarcerated. The questioner also informed Opelita that Anthony had "talked” about the murder. Opelita told her mother that she was scared and afraid for her brother, something she had never said before. Upon learning that her mother had reported this incident to Detective Quinones, Opelita Echevarria became upset and told her mother that she had "a big mouth”.
At 8:00 a.m. on March 17, Echevarria spoke by telephone with his fiancée, who informed him that his mother was worried about his testifying. In this call, she told him that someone had approached his sister and his mother and had asked them when he would be coming home from prison. Echevarria’s fiancée expressed fear for herself and her baby. At 8:10 a.m., Echevarria telephoned Estela, and in an extremely excited tone of voice, conveyed the messages already described, indicating that he would not testify because he felt his family was "in jeopardy”. The panic in his voice in itself renders incredible Echevarria’s proffered reasons for expressing *201 concern for his family, namely, that his family needed non-emergency help with rent and child care. Neither is his tone consistent with his explanation for the call, i.e., his fear that his lengthy stay in New York City in connection with this trial would delay his release on parole by two weeks, creating additional stress on the family, which, according to his testimony, had been doing reasonably well during the period of his incarceration.
On March 18, Echevarria appeared and testified to having seen two individuals on the west side of Second Avenue across from where he was standing using the phone, and observed one of them, identified by him as the shooter, run across Second Avenue in a crouched stance and reach the east side of the street no more than one store’s distance from where he was located. When asked if he saw the person who was shooting, Echevarria gave a negative response.
On March 20, Officer Vargas and AD As Estela and Campos met with Anthony Echevarria for approximately half an hour at the courthouse. At that time, Echevarria stated that after his Sunday morning conversation with his fiancée, he was afraid for his family, including his mother, sister, fiancée and her child. He said that he was afraid that something might happen to his family if he testified against Richard Cotto.

Sirois Issues

From these facts, the following salient points emerge. Defendant, who has been out on bail prior to and during this trial, had the opportunity to arrange for Echevarria’s intimidation. Defendant was the only person who stood to benefit if Echevarria suddenly became unavailable to testify against him at trial. Echevarria twice told police that immediately after shooting Davilla, defendant pointed the gun at him before running away, indicating defendant’s awareness of Echevarria’s importance as a potential witness against him (see, People v Geraci, 85 NY2d, supra, at 369-370), as well as evidencing a prior instance of intimidation by defendant against Echevarria. That defendant intimidated Echevarria on November 28, 1992 is further supported by the fact that Echevarria did not give his real name to the police at the scene and was afraid to name the shooter in his statement at the 23rd Precinct shortly after the incident.
In addition, once Echevarria’s name surfaced as the People’s sole living eyewitness during the week of March 11, people from the neighborhood confronted Echevarria’s sister on *202 defendant’s block and inquired about Anthony’s pending release from prison. In describing that conversation to Detective Quinones, Opelita Echevarria, while declining to identify the speakers, repeatedly referred to defendant and his family during the interview, and described them as being dangerous and willing to kill persons who testified against them. Immediately after learning about the approach to his sister, Echevarria called the prosecutor in a panic and stated that his family was in jeopardy, he would not testify, and that he did not know anything and had not seen anything. The following day, Echevarria spontaneously stated in open court that Spanish Harlem is a small place and his family has to live there. Two days later, Echevarria told Officer Vargas that after receiving his fiancée’s telephone call on Sunday, he was afraid for his family’s welfare if he testified against Richard Cotto. Finally, when testifying during the Sirois hearing, Echevarria disavowed the statements he had made on two occasions the previous week unequivocally identifying Cotto as the shooter, despite his awareness that Vargas and Quinones had testified to those statements during the hearing, urging, incredibly, that he could not see the shooter. He then offered a thoroughly nonsensical explanation of his recorded message to Estela on March 17.
Although none of these circumstantial facts would, in isolation, satisfy the People’s burden at this hearing, I find that in combination, these facts and the inferences that logically flow from them are more than sufficient, under the clear and convincing evidence standard, to support a determination that the witness changed his testimony and became unavailable to the People due to intimidation which was either initiated or approved by defendant.
Furthermore, I find that the out-of-court statements of the witness on March 13 and 14 are sufficiently reliable that due process is not violated by their admission. Although these statements were not sworn, this fact is not dispositive. (People v Maher, 225 AD2d 549; see, United States v Thai, 29 F3d 785 [2d Cir], cert denied sub nom. Tran v United States, 512 US 1239 [1994]; United States v Aguiar, 975 F2d 45, 47 [2d Cir 1992], supra; Rice v Marshall, 709 F2d 1100 [6th Cir 1983], cert denied 465 US 1034 [1984], supra.) These statements were repeated on two separate occasions to several government witnesses without any promises or threats having been made, and Echevarria had no motive to fabricate allegations against defendant which could put his life in danger. He provided a lucid, consis *203 tent narrative on each occasion, which conformed in all but one respect to his trial and hearing testimony. These facts all constitute circumstantial indicia of trustworthiness of Echevarria’s out-of-court statements to the police and Assistant District Attorneys on March 13 and 14. Accordingly, I rule that they are sufficiently reliable to be admitted at trial.
As already noted, under the law of New York a defendant whose misconduct causes the unavailability of an adverse witness forfeits his right to confront and cross-examine that witness on the substance of the out-of-court statements received in evidence as a consequence of the defendant’s misconduct. (People v Geraci, supra, at 367.) In this case, however, it would seem appropriate to follow the Federal rule, which holds that the defendant who commits such misconduct forfeits his right of confrontation for all purposes as to that witness. (United States v Aguiar, supra, at 47.) No truth-serving function will be served by allowing defendant to cross-examine Echevarria on any subject, under the circumstances here presented. Because the jury will have before it Echevarria’s live direct testimony as well as his out-of-court statements to the police, however, an appropriate limiting instruction will be given to the jury by the court.

Ventimiglia Issues

The People’s contention that they should be allowed to put before the jury evidence of the threats made by defendant against Anthony Echevarria and his family raise issues under People v Molineux (168 NY 264 [1901]) and People v Ventimiglia (52 NY2d 350 [1981]). Evidence of threats by a defendant against an adverse witness may be admissible on the issue of consciousness of guilt. (People v Reyes, 162 AD2d 357 [1st Dept], lv denied 76 NY2d 896 [1990].)
In assessing whether the evidence in question is more probative than prejudicial, I find that the gunpoint threat made by defendant to Echevarria on the night of the crime is highly probative of defendant’s consciousness of guilt and exceeds the prejudicial effect of such evidence. For this reason, and because of my Sirois findings, I hold that evidence of Echevarria’s statements regarding defendant pointing the gun at him after seeing him at the scene of the crime is admissible to establish defendant’s consciousness of guilt. (See, People v Maher, 225 AD2d 549, supra; People v Delarosa, 218 AD2d 667 [2d Dept 1995].)
*204 With respect to the introduction of evidence of the threats conveyed to Echevarria’s sister, the People’s evidence is entirely hearsay and, despite its utility at the evidentiary hearing, may not be admitted at trial. (People v Downing, 112 AD2d 24 [4th Dept 1985].)
For these reasons, the People may offer evidence of the gunpoint threat on November 28, 1992, which will be accompanied by a limiting instruction by the court. In all other respects, their Molineux application is denied.

. See, Matter of Holtzman v Hellenbrand, 92 AD2d 405, 415 (2d Dept 1983).

. The only other evidence the prosecution has proffered linking defendant to the crime is the deathbed statement of the victim made in the ambulance en route from the scene of the shooting to the hospital, and received in evidence as an excited utterance.

. For the reasons stated in this opinion, I respectfully disagree with Professor Peter Preiser, to the extent that he suggests that the Court of Appeals in Geraci (supra) judicially legislated an exception to the provisions of CPL 670.10. (See, Preiser, Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 11A, CPL 670.10, 1996 Pocket Part, at 13.)

. In Geraci, the Court did not reach the issue of the minimal limits of reliability necessary for introduction of a hearsay statement under the Sirois rule. (People v Geraci, supra, at 369, n 4; cf., United States v Aguiar, 975 F2d 45, 47 [2d Cir 1992] [holding that reliability of hearsay must still be determined as a matter of due process under United States v Mastrangelo, supra]; People v Sweeper, 122 Misc 2d 386, 394 [Sup Ct, NY County 1984, Altman, J.] [evaluating reliability of hearsay statement as part of court’s Sirois determination].)