*80 Smith, J.
(dissenting). Because I believe that this Court cannot accept a decision by a trial court that it will not follow a rule of law announced by this Court, I dissent. In addition, the ruling by the trial court took away completely the right of the defendant to confront the primary witness against him in this proceeding.
On the night of November 28, 1992, Steven Davilla was shot to death on a street in Manhattan. The only living eyewitness to the crime at the time of the trial was Anthony Echevarria. From the time of the shooting in 1992 until a few days before the trial in 1996, the witness never identified defendant as the shooter. Shortly before trial, Echevarria informed the prosecutors that he had seen the defendant shoot the deceased. On Sunday, March 17, 1996, the day before his scheduled testimony in the trial of the defendant, Echevarria telephoned the prosecutor in the case from Hikers Island where he was being held on an unrelated charge and left a message that he would say nothing and that his family was in jeopardy.
The next morning the prosecutors interviewed Echevarria and then held an ex parte conference with the court. The prosecutors told the court that Echevarria’s mother and wife had been told that there was a contract on Echevarria and they wanted to know whether Echevarria was going to testify in the case. The court offered to postpone Echevarria’s testimony, but the People declined the offer. When Echevarria was called to the stand, he testified that he did not see the person who had shot Davilla. After a sidebar conference and after the jury was removed from the courtroom, Echevarria stated
“Spanish Harlem is a small place, okay. My family lives there. All right. I don’t live there. Okay. Steven was a friend of mine, a good friend of mine. All right. Now, see, I got to think about my family, all right. Even though I’m not going to live there, my family is going to be there, you know what I’m saying. And — .”
Echevarria was then excused from the courtroom. The People moved to introduce into evidence Echevarria’s out-of-court statements in which he identified Cotto as the shooter. The People also moved to introduce into evidence threats allegedly made to Echevarria’s relatives, arguing that this was circumstantial evidence of the defendant’s guilt.
As required, Supreme Court conducted a Sirois hearing (see, People v Geraci, 85 NY2d 359, 365; Matter of Holtzman v Hel *81 lenbrand, 92 AD2d 405). It concluded that there was clear and convincing evidence that Echevarria had “changed his testimony and became unavailable to the People due to intimidation which was either initiated or approved by defendant” (People v Cotto, 169 Misc 2d 194, 202). Consequently, the court held that Echevarria’s out-of-court statements to the prosecutors could be admitted at trial. However, the court further stated that “As already noted, under the law of New York a defendant whose misconduct causes the unavailability of an adverse witness forfeits his right to confront and cross-examine that witness on the substance of the out-of-court statements received in evidence as a consequence of the defendant’s misconduct [citing People v Geraci, 85 NY2d 359, 367]. In this case, however, it would seem appropriate to follow the Federal rule, which holds that the defendant who commits such misconduct forfeits his right of confrontation for all purposes as to that witness [citation omitted]. No-truth serving function will be served by allowing defendant to cross-examine Echevarria on any subject, under the circumstances here presented. Because the jury will have before it Echevarria’s live direct testimony as well as his out-of-court statements to the police, however, an appropriate limiting instruction will be given to the jury by the court” (People v Cotto, supra, at 203).
The trial court further permitted the introduction of evidence that defendant pointed a gun at the witness on the night of the shooting as consciousness of guilt. The court stated:
“In assessing whether the evidence in question is more probative than prejudicial, I find that the gunpoint threat made by defendant to Echevarria on the night of the crime is highly probative of defendant’s consciousness of guilt and exceeds the prejudicial effect of such evidence. For this reason, and because of my Sirois findings, I hold that evidence of Echevarria’s statements regarding defendant pointing the gun at him after seeing him at the scene of the crime is admissible to establish defendant’s consciousness of guilt” (169 Misc 2d, at 203 [citations omitted]).
The court did not permit the introduction of threats allegedly made to Echevarria’s sister.
Defendant was subsequently convicted and sentenced. The Appellate Division affirmed the conviction (People v Cotto, 240 AD2d 193).
*82 A.
In People v Geraci (85 NY2d 359, supra), this Court held that where a defendant has procured a witness’s unavailability through violence, threats or chicanery, a trial court may admit, as direct evidence, the out-of-court statements, including Grand Jury testimony, made by the now unavailable witness (id., at 365-366). While recognizing the necessity, on grounds of public policy, of “reducing the incentive to tamper with witnesses” (id., at 368), the language and tenor of the decision make clear that the Court was concerned by the possible repercussions of such a rule. In order to mitigate the attendant dangers, this Court held that such testimony would only be admissible where clear and convincing evidence of defendant’s misconduct had been proffered. Rejecting the Federal “preponderance of the evidence” standard, the Court stated the clear and convincing standard was “more exacting” (id., at 367) and was “the test that best recognizes the gravity of the interest at stake and most effectively balances the need to reduce the risk of error against the practical difficulties of proving witness tampering” (id., at 367).
The Court also recognized that a finding of misconduct by the defendant would result in that defendant’s forfeiture of the right to cross-examine the witness about the substance of the statements initially made by the witness. To even this limited and narrow abridgment of the right of confrontation, we stated:
“[A] defendant’s loss of the valued Sixth Amendment confrontation right constitutes a substantial deprivation. Additionally, and even more significantly, society has a weighty investment in the outcome, ‘[b]ecause of the intimate association between the right to confrontation and the accuracy of the fact-finding process’ ” (id., at 367 [citation omitted]).
The Court’s concern was obvious and manifest. By requiring the proffer of clear and convincing evidence, the Court sought to minimize the damage its rule could wreak upon “the process of determining the truth in adjudicative proceedings” (id., at 367). It is clear then that the Court’s decision to limit the loss of the fundamental right of confrontation only to the substance of the hearsay statements is consistent with the tone, tenor and language of the decision, and its desire to protect and insure the integrity of the truth-seeking process (see, e.g., People v Maher, 89 NY2d 456, 461 [rejecting the expansion of *83 the Geraci rule and recognizing “the weighty countervailing interests, that is, the constitutional right of confrontation and the strong New York policy for narrow treatment of exceptions to the hearsay rule”]).
The Federal rule adopted by the trial court was articulated in United States v Aguiar (975 F2d 45). There, the defendant was arrested on drug charges with the assistance of George Albino, a courier. Approximately four months after defendant’s arrest, and after Albino had entered into a plea agreement, Albino told the Government that he would no longer cooperate because he had been threatened by the defendant. Albino expressed fear for himself and his family. Pursuant to a search warrant, agents found two threatening letters in Albino’s prison cell. One letter contained defendant’s fingerprints and the other was from “a very good friend of [the defendant.]”
Faced with Albino’s continued refusal to cooperate, the Government sought a hearing and attempted to introduce Albino’s prior testimony inculpating the defendant (see, United States v Mastrangelo, 693 F2d 269). The District Court admitted the testimony and held that defendant had procured Albino’s unavailability, and had thereby waived his confrontation rights and hearsay objections (United States v Aguiar, supra, at 47). The Second Circuit affirmed. It held that “although Mastrangelo involved sworn grand jury testimony, we did not there, and do not here, limit its rationale to such testimony. A defendant who procures a witness’s absence waives the right of confrontation for all purposes with regard to that witness, not just to the admission of sworn hearsay statements” (id., at 47 [emphasis supplied]).
By comparison, in People v Geraci (supra), this Court held that “[a] determination that the defendant has procured a witness’s unavailability results in the admission of hearsay statements and the forfeiture of the right to cross-examine about the substance of those statements” (id., at 367 [emphasis supplied]).
Yet, the trial court explicitly and inexplicably rejected this Court’s rule. It stated that a recent articulation of State law should not be deemed authoritative and, instead, Federal law should supply the operative rule (see, United States v Aguiar, supra, at 47). In clear contravention of State decisional law, the trial court specifically stated:
“In this case, however, it would seem appropriate to follow the Federal rule, which holds that the de *84 fendant who commits such misconduct forfeits his right of confrontation for all purposes as to that witness [citation omitted]. No-truth serving function will be served by allowing defendant to cross-examine Echevarria on any subject, under the circumstances here presented” (People v Cotto, 169 Misc 2d 194, 203, supra).
The majority has concluded that defense counsel’s failure to object places the issue beyond our reach. It should be clear, however, that defense counsel did oppose the prosecutor’s efforts to admit the out-of-court statements into evidence, arguing that the evidence that defendant threatened the witness was not clear and convincing and protesting the loss of the right of cross-examination. Thus, in accordance with CPL 470.05, defendant made clear what ruling was desired. In my view, no further objection was necessary, particularly when the court stated that it would not follow the rule of law announced by this Court.
There can be no doubt that the trial court’s ruling deprived the defendant of his right of confrontation even more so than the Geraci rule envisioned or necessitated. Several reasons underscore the importance of cross-examination in this case. First, Echevarria was the only living witness against the defendant. The defendant’s freedom rested upon the strength and weakness of this sole witness’s testimony. The removal of defendant’s right to confront this sole witness against him was a fatal blow to defendant’s case. Second, a cross-examination of the witness could have brought forth the fact that the witness had a motive to support the People’s view of the evidence. According to defense counsel, cross-examination as to the timing of Echevarria’s statements inculpating the defendant would have revealed that these statements were made only during a period when Echevarria had a motive to fabricate. Specifically, the statements were made while there existed the possibility that cooperation with the People would speed his release from prison. Additionally, defense counsel argued that cross-examination could have revealed that the sole witness against the defendant was less than forthcoming on the stand in describing his prior offenses, and that in the witness’s initial discussions with the police investigators, he did not name the defendant as the shooter. The relative merits of these arguments, and the weight, if any, to be accorded them, should have been questions for the jury to determine.
*85 B.
Contrary to the trial court’s decision, there was no clear and convincing evidence that defendant engaged in misconduct so as to render the witness unavailable. While the majority relates the facts of this case to those in People v Geraci (supra), it is clear that there is a substantial difference between the two cases. First, a defendant will always be the greatest beneficiary where the primary and only witness against him refuses to testify against him. But unless there is clear and convincing evidence linking the defendant to the witness’s subsequent refusal to testify, a defendant should not be penalized for the witness’s action. It is possible, or even likely, that a witness in a criminal trial will come to realize, on his or her own, that testimony against the accused may put that witness or his or her family at risk of retaliation or retribution. Or it may be that the witness, becoming more and more aware of the risk of harm as the trial looms large, experiences an inchoate fear or senses danger lurking behind every gesture or word. In these circumstances, the witness will understandably seek to renege on his prior statements and may do so by stating that a threat has been made against the witness’s safety or that of his or her family. But Geraci has made it clear that the focus of the court’s inquiry should not be upon either the existence of a risk of harm or upon the perceived sincerity of the witness’s, or his family’s, fear. Rather, the critical gaze of the court must rest upon what role, if any, the defendant, or those acting on his behalf, played in bringing about the witness’s unavailability. Without clear and convincing evidence of such interference, a defendant may not be held to have waived his constitutional right.
In Geraci, not only was the defendant out on bail, but he also approached the chief witness against him and stated that his lawyer wanted to discuss the case with the witness. Additionally, a known and identifiable individual — the defendant’s uncle — spoke with the witness, and several thousand dollars was promised to the witness. In fact, at the time of the trial, the witness had already received $2,000 and was to receive $250 per week until the end of the trial.
In the instant case, the witness, Echevarria, claimed that “someone” had approached his mother and sister and inquired as to his whereabouts. He also stated that “there would probably be a contract” out on him. Echevarria’s sister claimed that “unidentified people” from the neighborhood had approached *86 her and asked where he was being housed at Rikers Island. These same “unidentified individuals” also allegedly expressed dismay that he was going to testify. Echevarria’s sister stated that the “word on the street” was that Echevarria was “talking.” Additionally, his sister stated that she knew that defendant’s family had “killed a family a while ago.” Next, Echevarria’s mother stated that while no one in the community had uttered a single word to her, her daughter had related to her the story of being approached by one or more unidentified individuals questioning the whereabouts of the witness.
This is the sum and substance of the evidence of defendant’s alleged threats causing the witness’s unavailability. Such “proofs” simply do not rise to the level of clear and convincing evidence. There is no proof that a “contract” existed on the witness. There is no proof that the defendant or anyone acting on his behalf ever spoke to the witness’s sister. Although defendant was out on bail, there is no proof that he or anyone associated with him made any contact with the witness (see, People v Hamilton, 70 NY2d 987, 988). Instead, the People proffer, as evidence of a threat, the statement of Echevarria, the witness, that the defendant, at the time of the shooting, looked Echevarria in the eye and pointed a gun at him. However, even assuming this statement to be true, and the incident did occur on November 28, 1992, the incident appears to be of little relevance since Echevarria went on to identify the defendant on two separate occasions — March 13 and March 14, 1996. Thus, this alleged incident, occurring almost four years before Echevarria first identified the defendant, then withdrew his identification, can hardly be the threat which caused the defendant’s unavailability.
Most troubling is the precedent being set by this Court in sustaining the trial court’s ruling. Under the authority of this case, vague allegations of “word on the street” combined with tales of unsubstantiated visits by unnamed individuals will suffice to establish clear and convincing evidence of a defendant’s unlawful interference with a witness. Such a conclusion could not have been intended by this Court when it reasoned that “our statutory and decisional law counsels a cautious approach that permits use of the exception only when the predicate facts are proven with the degree of certainty that the ‘clear and convincing evidence’ test assures” (People v Geraci, 85 NY2d 359, 368-369, supra). The truth-seeking and truth-protecting aspects of the “clear and convincing” standard are not preserved by an affirmance in this case.
*87 c.
Although the court held that the victim’s statements could not be admitted into evidence as dying declarations, the court erred in admitting the statements as excited utterances. It has been clearly established that an out-of-court statement may be introduced for the truth of its content if the statement is made “before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance” (People v Marks, 6 NY2d 67, 72). The linchpin of an excited utterance is that
“ ‘under certain circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control * * *. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker’s belief as to the facts just observed by him; and may therefore be received as testimony to those facts’ ” (id., at 71-72).
Moreover, “[w]hile the statement must have been made before the declarant had the opportunity to reflect, ‘ “the time for reflection is not measured in minutes or seconds,” ’ but rather ‘ “is measured by facts” ’ ” (People v Vasquez, 88 NY2d 561, 579). Before admitting a statement as an excited utterance, the trial court must
“ ‘assess not only the nature of the startling event and the amount of time which has elapsed between the occurrence and the statement, but also the activities of the declarant in the interim to ascertain if there was significant opportunity to deviate from the truth. Above all, the decisive factor is whether the surrounding circumstances reasonably justify the conclusion that the remarks were not made under the impetus of studied reflection’ ” (People v Brown, 70 NY2d 513, 519 [citation omitted] [emphasis in the original]).
The facts of this case show that the victim, Steven Davilla, was found lying in the street at 103d Street and Second Ave *88 nue by two officers. Though no blood was visible, it was believed that Davilla had sustained a gunshot wound to the abdomen or chest, and the officers summoned an ambulance. When the ambulance arrived, Davilla, who was conscious and lucid, was placed on a gurney and into the ambulance. An officer rode along with the victim. As the ambulance sped away, the officer asked Davilla, “Who shot you?” Davilla responded by tapping his own chest and saying, “I know.” Believing that Davilla did not want to speak with the officer, the emergency medical technician on board told Davilla, ‘You’re not doing too good. Why don’t you talk to the officer.” The officer reiterated this assertion.
At this point, Davilla began to cooperate and gave the officer his name, address and apartment number. The officer then asked, “Who shot you?” and Davilla replied, “Richie.” The officer asked for “Richie’s” last name, but Davilla did not answer. So the officer again stated, “Do you realize that there’s a good chance you’re going to die?” Davilla responded, ‘Yeah.” After some period of time — perhaps seconds, perhaps minutes— Davilla stated that the shooter was “Richie from my building.” The officer asked whether the shooter was named “Richard Cotto,” and Davilla responded affirmatively and added that it was “Richie from the fourth floor.” At this point in time, the officer again asked, “Do you realize that there’s a chance you’re going to die?” and Davilla again responded affirmatively. The officer then asked, “Are you sure who shot you?” and Davilla responded, “Yeah” and — seconds or minutes later — added, “Richie Cotto shot me.” At this time, according to the testimony of the officer, Davilla became somewhat ashen and began to experience some difficulty breathing. But the officer was able to ask, “What kind of car does he drive, because I want to make sure we’re talking about the same person here. What kind of car does he drive?” And Davilla was able to respond that it was a white car.
It is difficult to conclude from this recitation of the facts that the victim’s statements constituted an excited utterance. It is evident that the witness listened to the multiple questions and proddings of both officer and technician, reflected upon his answers, deliberated before responding, and weighed his responses accordingly. A statement or utterance made in response to an inquiry is merely one factor bearing on spontaneity (see, People v Edwards, 47 NY2d 493, 498; People v Brown, 70 NY2d 513, 522, supra [the “nature, extent and purpose of the questions and the identity, position and manner of the *89 questioner” are additional factors to be considered]). However, the facts of this case demonstrate that the officer was engaged in a conversation with the witness and was clearly attempting to prod loose from the witness the name of his attacker.
The facts show that the witness at first affirmatively declined to name his attacker. There was no evidence that this reluctance was occasioned by his medical condition rather than his own cognitive function or decision-making process. But after continuous prompting by the medical technician and police officer, the witness offered a first name. And again, after gentle and helpful reminders of his imminent demise, the witness agreed that his attacker was the defendant. In fact, the medical technician’s own observations and testimony support the view that Davilla clearly reflected upon his statements before responding to the officer’s inquiries. When asked during cross-examination whether it was the patient or the officer who first named the defendant, the medical technician stated:
“The patient [said] ‘Richie.’ He didn’t say it right away. He sort of like thought about it for a few seconds and then he said ‘Richie’.”
The safeguards or indicia of reliability which form the core of this hearsay exception are greatly attenuated in this case. There is no doubt that "a gunshot wound constitutes an “external startling event” (People v Edwards, 47 NY2d 493, 497, supra) which may precipitate an excited utterance. However, there is no presumption that a statement attendant to the infliction of such a wound will in all cases constitute an excited utterance. The circumstances of each case and the behavior of each witness must be carefully examined (see, People v Brown, supra, at 522 [“The focus of the inquiry remains the same: the physical, psychological, and emotional condition of the declarant and whether it can be reasonably concluded ‘that the remarks were not made under the impetus of studied reflection’.”]). Here, there was no evidence of the “extreme pain and unrelenting physical and emotional trauma” that this Court found dispositive in People v Brown (supra, at 520). In fact, neither the officer nor the medical technician testified that the victim himself expressed any sense of urgency or fear during the questioning, or that he appeared to be excited or under stress when he spoke (see, People v Nieves, 67 NY2d 125, 135). As previously stated, the witness was conscious and lucid throughout the majority of the questioning. The deliberative and reflective nature of Davilla’s statements *90 in response to questions by the officer and medical technician is striking and should have served to remove the statements from the realm of the excited utterance exception.
Also relevant here are the allegations of a long-standing feud or enmity between Davilla and the defendant and the fact that the witness died before trial and thus could not be subject to cross-examination (see, 6 Frumer and Biskind, Bender’s New York Evidence — CPLR § 24.03 [1], at 24-6 [stating that factors that must be taken into account in determining whether a declaration was an excited utterance include “the fact that the complainant was subject to cross-examination”]).
Thus, I conclude that the trial court’s failure to follow State decisional law which caused defendant to be deprived of his constitutional right of confrontation provides sufficient ground upon which to reverse the order of the Appellate Division. Additionally, there was no clear and convincing evidence of defendant’s misconduct. Finally, the trial court erred when it admitted into evidence the testimony of the victim as an excited utterance.
Accordingly, I would reverse the order of the Appellate Division and order a new trial.
Judges Bellacosa, Levine, Ciparick and Wesley concur with Chief Judge Kaye; Judge Smith dissents and votes to reverse in a separate opinion in which Judge Titone concurs.
Order affirmed.