92 N.Y.2d 68 (1998)
699 N.E.2d 394
677 N.Y.S.2d 35
The People of the State of New York, Respondent,
v.
Richard Cotto, Appellant.
Court of Appeals of the State of New York.
Argued June 2, 1998
Decided July 1, 1998.
Carro, Velez, Carro & Mitchell, L. L. P., New York City (John Carro of counsel), for appellant.
Robert M. Morgenthau, District Attorney of New York County, New York City (Donna Krone and Robert M. Raciti of counsel), for respondent.
Judges BELLACOSA, LEVINE, CIPARICK and WESLEY concur with Chief Judge KAYE; Judge SMITH dissents and votes to reverse in a separate opinion in which Judge TITONE concurs.
*72 Chief Judge KAYE.
Whenever the People allege specific facts which demonstrate a "distinct possibility" that a criminal defendant has engaged in witness tampering, the court must grant a Sirois hearing to test the validity of that claim (see, Matter of Holtzman v Hellenbrand, 92 AD2d 405, 415; see also, People v Geraci, 85 N.Y.2d 359). Defendant challenges his conviction for second degree murder and related crimes primarily on the ground that the trial court's ruling after a Sirois hearing was flawed in several *73 respects. Perceiving no error warranting a new trial, we affirm the Appellate Division order upholding the conviction.

I.
At defendant's March 1996 trial for the shooting death of Steven Davilla in New York City, the prosecution planned to call eyewitness Anthony Echevarria, a 22-year-old neighborhood resident who knew both defendant and the victim. The People indicated in pretrial disclosure to defense counsel and in their March 15 opening statement that Echevarria would testify that he was present at the time Davilla was shot and that defendant was the shooter. Echevarria had met with prosecutors and the police on March 13 and 14, at which time he had identified defendant as the shooter.
On March 17, the day before he was to testify, Echevarria, then incarcerated at Rikers Island on an unrelated charge, telephoned the lead prosecutor and left a voicemail message that he would no longer testify as to the shooter's identity. He said that his family was "in jeopardy" and "everything is off, I'm not doing nothing. You put me on the stand, do whatever you got to do but I don't know nothing. I didn't see nothing * * * Forget everything."
After informing the trial court of this development the next morning, the prosecution met with Echevarria, at which time the witness promised that he would tell the truth about what he had seen. When called at trial later that day, however, Echevarria once again claimed he could not identify the shooter and asked to speak to the Trial Judge. As he told her:
"Spanish Harlem is a small place, okay. My family lives there. All right. I don't live there. Okay.
"Steven was a friend of mine, a good friend of mine. All right.
"Now, see, I got to think about my family, all right. Even though I'm not going to live there, my family is going to be there, you know what I'm saying."
The People at that point noted that Echevarria had told a prosecutor that some men had approached members of his family and gave them reason to believe that there was a "contract" out on him, and they moved to introduce the prior statements Echevarria had made to law enforcement officials implicating defendant. The court ordered a Sirois hearing to test the People's assertion that defendant had intimidated Echevarria.
*74 At the hearing, the People called Police Officer Wilson Vargas and Detective Hedxan Quinones, who had been present at the March 13 and 14 trial preparation sessions. They testified that at the first session the prosecutor confronted Echevarria with a written statement he had made to the police shortly after the murder in which he gave a false name and did not identify the shooter; Echevarria responded that he had been scared at the time. In each of the sessions, according to these witnesses, Echevarria described the events he saw the night of the shooting, relating that while he was using a telephone on the corner, he saw defendant cross the street in a crouched manner, holding his hand close to his side. When he reached the corner, defendant approached Davilla, said "What's up now, money?" pointed a gun at Davilla and shot him. Davilla fell backward, stumbled and attempted to run away. Defendant followed, continuing to fire shots. Defendant then turned around, looked at Echevarria face-to-face, pointed the gun at him without firing, and fled. Vargas and Quinones further testified that during the two sessions, Echevarria was seated in a chair, was not in handcuffs, did not appear nervous, demonstrated a positive frame of mind, engaged in conversation without any sign of discomfort and was not promised anything for his trial testimony.
Officer Vargas testified, additionally, that he and a prosecutor met with Echevarria again on March 20, two days after Echevarria testified that he could not identify the shooter, but before the Sirois hearing. Echevarria said at that meeting that early on the day before he was to testify, he spoke by telephone to his fiancée. She had expressed fear for herself and her child, and told him that someone had approached his mother and sister and inquired as to his whereabouts. Echevarria said that he was afraid "something might happen to [his] family" if he testified and that "there would probably be a contract" out on him.
Detective Quinones further testified that he had spoken with Echevarria's mother and sister a few days before the Sirois hearing. The sister told Quinones that a few days earlier, unidentified people from her neighborhood had approached her and asked her exactly where Echevarria was being housed in Rikers Island. She told the detective that "word on the street" was that her brother "was talking." She added that she knew defendant's family had "killed a family a while ago" and that if anyone talked against defendant's family, they would be killed.
When called by the People at the Sirois hearing, both Echevarria and his sister denied the statements attributed to them *75 indicating that threats had been made. The sister denied that she had been harassed, and denied telling Detective Quinones or her mother about a conversation with the harassing party. Moreover, although testifying that she knew Richie Cotto by face, when asked if she could identify him in the courtroom, she answered, several times, "I don't know." Echevarria himself reiterated his trial testimony that he could not identify the shooter, and explained the voicemail message by stating that he did not want to testify at trial because he did not want to miss an upstate parole hearing, since that would delay his release date from prison and adversely affect his family.
The People also called Echevarria's mother as a hearing witness. She testified that prior to the morning of March 17, her daughter had told her that someone had stopped her in the street with her baby and had asked whether her brother was incarcerated. The questioner also stated that Echevarria had "talked" about the murder. Echevarria's mother testified that her daughter said she was scared and afraid for her brother  a sentiment she had never previously expressed. When her daughter learned that her mother had related this incident to Quinones, she became upset and told her mother that she had a "big mouth."
At the conclusion of the hearing, the trial court announced that the People had met their burden of showing, by clear and convincing evidence, that Echevarria had been intimidated by defendant, that his March 13 and 14 statements would be admitted at trial, and that cross-examination of Echevarria would not be permitted but that the jury would have before it "Echevarria's live direct testimony as well as his [conflicting] out-of-court statements to the police." Defense counsel asked whether she would be permitted to question Vargas and Quinones about the "res gestae of the statement," but otherwise made no objection regarding cross-examination. The Trial Judge later issued a written opinion on the Sirois issues (see, 169 Misc 2d 194).
At trial, Quinones and Vargas testified as to Echevarria's statements at the March 13 and 14 meetings and were cross-examined by defense counsel. Echevarria did not return to the stand. The jury ultimately returned a guilty verdict. On appeal, the Appellate Division affirmed defendant's conviction, and we now affirm the order of that court.

II.
In People v Geraci (85 N.Y.2d 359), we held that at a Sirois hearing, the People must demonstrate by clear and convincing *76 evidence that the defendant, by violence, threats or chicanery, caused a witness's unavailability. If the People meet that burden, the defendant is precluded from asserting either "the constitutional right of confrontation or the evidentiary rules against the admission of hearsay in order to prevent the admission of the witness's out-of-court declarations" (id., at 366). Contrary to defendant's argument, we conclude that the People satisfied their heavy burden, so that Echevarria's out-of-court declarations could be evaluated by the jury.
First, there was sufficient evidence to establish that threats were made against Echevarria. At the Sirois hearing, Quinones and Vargas testified as to Echevarria's out-of-court statements as well as the interviews with his sister and mother, showing that he was prepared to identify defendant but had been scared into silence. Echevarria and his sister, in their testimony, denied that threats had been made and that they had told police or prosecutors anything about those threats. That credibility clash has been resolved by findings of the Trial Judge (who observed the witnesses)  affirmed by the Appellate Division  that the People's evidence was credible, the contrary evidence not. In the words of the trial court:
"during his testimony both on March 18 and again at the Sirois hearing, Echevarria appeared to be anxious, uncomfortable and forced in his responses, a demeanor inconsistent with truthfulness and consistent with a state of mind demonstrating a fear of harm to his family or to himself if he should testify against Richard Cotto" (169 Misc 2d 194, 198).
Similarly, the court rejected Echevarria's sister's testimony as incredible, finding that it conflicted with the testimony of Quinones and her own mother, as well as with Echevarria's out-of-court statements. The testimony of Detective Quinones and Officer Vargas, reporting Echevarria's March 13 and 14 statements, was by contrast found credible. In the courts' view, Echevarria's attempts at the Sirois hearing to explain his voice-mail message and March 18 statement to the court were unbelievable and wholly at odds with his panicked voice and demeanor on both occasions.
Second, the evidence is sufficient to link these threats to defendant. Because of "the inherently surreptitious nature of witness tampering" circumstantial evidence may be used to "establish, in whole or in part, that a witness's unavailability was procured by the defendant" (People v Geraci, 85 NY2d, supra, at 369). *77 Defendant, who knew Echevarria from his neighborhood, was out on bail when the threats were made and had the opportunity to arrange and orchestrate them. Echevarria and his family, moreover, received the threats immediately after it was revealed that he would implicate defendant  thus giving defendant uniquely good reason to want to intimidate Echevarria  and there was no suggestion that anyone else stood to gain from the witness's silence (see, by contrast, People v Geraci, supra, 85 NY2d, at 369-370). Additionally, as the trial court noted, defendant had previously successfully threatened Echevarria when, at the time of the shooting, he looked him in the eye and pointed a gun at him which prompted Echevarria to give the police a false name and deny being able to identify the shooter. All of these affirmed facts, together, clearly and convincingly link defendant to the threats.[1]
Defendant next challenges the reliability of Echevarria's statements. He claims that Geraci should be limited to Grand Jury testimony and that, even if discussions with law enforcement officials may be admissible, Echevarria's statements lack sufficient indicia of reliability to satisfy due process. Again, we perceive no error in the Appellate Division order.
Initially, we are unpersuaded by defendant's contention that Geraci is limited to admitting prior Grand Jury testimony of an intimidated witness. Although Geraci itself involved Grand Jury testimony, the Court did not limit its reach to those particular out-of-court statements and indeed made clear that it applied to "hearsay evidence such as the Grand Jury testimony" (id., at 368 [emphasis added]). Nor would the policy objectives underlying Geraci be served by foreclosing admissibility of other reliable evidence (see, id., at 367-368; see also, United States v Thai, 29 F.3d 785 [2d Cir] [prior statements to police admissible], cert denied sub nom. Lan Ngoc Tran v United States, 513 US 977; United States v Aguiar, 975 F.2d 45, 47 [2d Cir] [prior statements to drug enforcement agents and Assistant United States Attorney admissible]).
*78 While surely statements admitted pursuant to Geraci cannot be so devoid of reliability as to offend due process, no such danger is presented here. Echevarria's statements were repeated only days after they had first been made, were (according to the affirmed findings) lucid and credible, and described in detail defendant's actions both before and after the shooting. Those same statements were made on two separate occasions, and recounted in the testimony of two witnesses subject to cross-examination, thus making it unlikely that Echevarria was misunderstood. Additionally, the testimony indicated that Echevarria received no special treatment from the police and had no motive to change his original story and put himself or his family at risk. The statements were thus certainly sufficiently reliable for evaluation by the jurors.
Finally, defendant urges that the trial court improperly precluded him from any cross-examination of Echevarria as a result of the Sirois hearing. Indeed, defendant now argues to this Court that the trial court improperly adopted a standard used in Federal courts which, when the People meet their burden at the Sirois hearing, precludes cross-examination of the intimidated witness for all purposes (see, e.g., United States v Aguiar, 975 F.2d 45, 47, supra). This contention, however, was not raised by objection before the trial court and is thus unpreserved for our review.[2]

III.
Alternatively, defendant seeks reversal of his conviction on the ground that the trial court erroneously admitted statements of the victim, heard by a police officer and an Emergency Medical Technician in the ambulance on the way to the hospital, under the "excited utterance" exception to the hearsay rule. We conclude that the trial court's in limine ruling admitting the statements was correct, and do not reach the People's alternative argument that the statements qualified as dying declarations.
An excited utterance occurs "`"under the immediate and uncontrolled domination of the senses, and during the brief period *79 when considerations of self-interest could not have been brought fully to bear by reasoned reflection"'" (People v Brown, 70 N.Y.2d 513, 518). While it is critical that statements be made before a declarant had an opportunity to reflect, the relevant time period "`"is not measured in minutes or seconds" but rather "is measured by facts"'" (People v Vasquez, 88 N.Y.2d 561, 579). The court must examine "not only the nature of the startling event and the amount of time which has elapsed between the occurrence and the statement, but also the activities of the declarant in the interim" (People v Edwards, 47 N.Y.2d 493, 497). That statements were made in response to an inquiry does not disqualify them as excited utterances but rather is a fact to be considered by the trial court (id., at 498-499).
Here, as found by the trial court and affirmed by the Appellate Division, the victim was severely wounded by a gunshot from close range and attempted to escape additional shots fired at him by defendant. The victim's injuries were severe enough that he had no discernible blood pressure on his trip to the hospital, leading the attending EMT to conclude that he was going into shock and could die. Although the victim remained lucid for much of his trip in the ambulance, he was in great pain, his condition only worsened and his physical shock and trauma never subsided.[3] It is this extraordinary stress that prevented Davilla from engaging in reflection and gives his statements the necessary indicia of reliability (People v Vasquez, 88 N.Y.2d 561, 579, supra). Neither the short interval between the shooting and the statements, nor the fact that the statements were made in response to questioning was sufficient to interrupt the excitement of the shooting and consequent injuries (People v Brooks, 71 N.Y.2d 877 [2½-hour delay between injury and statements, prompted by questioning]; People v Brown, 70 N.Y.2d 513, supra [30-minute delay between injury and statements, prompted by questioning]). Thus, we cannot say that the trial court erred as a matter of law in admitting the victim's statements.
Defendant's remaining contentions are either unpreserved or without merit.
Accordingly, the order of the Appellate Division should be affirmed.
*80 SMITH, J. (dissenting).
Because I believe that this Court cannot accept a decision by a trial court that it will not follow a rule of law announced by this Court, I dissent. In addition, the ruling by the trial court took away completely the right of the defendant to confront the primary witness against him in this proceeding.
On the night of November 28, 1992, Steven Davilla was shot to death on a street in Manhattan. The only living eyewitness to the crime at the time of the trial was Anthony Echevarria. From the time of the shooting in 1992 until a few days before the trial in 1996, the witness never identified defendant as the shooter. Shortly before trial, Echevarria informed the prosecutors that he had seen the defendant shoot the deceased. On Sunday, March 17, 1996, the day before his scheduled testimony in the trial of the defendant, Echevarria telephoned the prosecutor in the case from Rikers Island where he was being held on an unrelated charge and left a message that he would say nothing and that his family was in jeopardy.
The next morning the prosecutors interviewed Echevarria and then held an ex parte conference with the court. The prosecutors told the court that Echevarria's mother and wife had been told that there was a contract on Echevarria and they wanted to know whether Echevarria was going to testify in the case. The court offered to postpone Echevarria's testimony, but the People declined the offer. When Echevarria was called to the stand, he testified that he did not see the person who had shot Davilla. After a sidebar conference and after the jury was removed from the courtroom, Echevarria stated
"Spanish Harlem is a small place, okay. My family lives there. All right. I don't live there. Okay. Steven was a friend of mine, a good friend of mine. All right. Now, see, I got to think about my family, all right. Even though I'm not going to live there, my family is going to be there, you know what I'm saying. And ."
Echevarria was then excused from the courtroom. The People moved to introduce into evidence Echevarria's out-of-court statements in which he identified Cotto as the shooter. The People also moved to introduce into evidence threats allegedly made to Echevarria's relatives, arguing that this was circumstantial evidence of the defendant's guilt.
As required, Supreme Court conducted a Sirois hearing (see, People v Geraci, 85 N.Y.2d 359, 365; Matter of Holtzman v Hellenbrand, 92 AD2d 405). *81 It concluded that there was clear and convincing evidence that Echevarria had "changed his testimony and became unavailable to the People due to intimidation which was either initiated or approved by defendant" (People v Cotto, 169 Misc 2d 194, 202). Consequently, the court held that Echevarria's out-of-court statements to the prosecutors could be admitted at trial. However, the court further stated that "As already noted, under the law of New York a defendant whose misconduct causes the unavailability of an adverse witness forfeits his right to confront and cross-examine that witness on the substance of the out-of-court statements received in evidence as a consequence of the defendant's misconduct [citing People v Geraci, 85 N.Y.2d 359, 367]. In this case, however, it would seem appropriate to follow the Federal rule, which holds that the defendant who commits such misconduct forfeits his right of confrontation for all purposes as to that witness [citation omitted]. No-truth serving function will be served by allowing defendant to cross-examine Echevarria on any subject, under the circumstances here presented. Because the jury will have before it Echevarria's live direct testimony as well as his out-of-court statements to the police, however, an appropriate limiting instruction will be given to the jury by the court" (People v Cotto, supra, at 203).
The trial court further permitted the introduction of evidence that defendant pointed a gun at the witness on the night of the shooting as consciousness of guilt. The court stated:
"In assessing whether the evidence in question is more probative than prejudicial, I find that the gunpoint threat made by defendant to Echevarria on the night of the crime is highly probative of defendant's consciousness of guilt and exceeds the prejudicial effect of such evidence. For this reason, and because of my Sirois findings, I hold that evidence of Echevarria's statements regarding defendant pointing the gun at him after seeing him at the scene of the crime is admissible to establish defendant's consciousness of guilt" (169 Misc 2d, at 203 [citations omitted]).
The court did not permit the introduction of threats allegedly made to Echevarria's sister.
Defendant was subsequently convicted and sentenced. The Appellate Division affirmed the conviction (People v Cotto, 240 AD2d 193).

*82 A.
In People v Geraci (85 N.Y.2d 359, supra), this Court held that where a defendant has procured a witness's unavailability through violence, threats or chicanery, a trial court may admit, as direct evidence, the out-of-court statements, including Grand Jury testimony, made by the now unavailable witness (id., at 365-366). While recognizing the necessity, on grounds of public policy, of "reducing the incentive to tamper with witnesses" (id., at 368), the language and tenor of the decision make clear that the Court was concerned by the possible repercussions of such a rule. In order to mitigate the attendant dangers, this Court held that such testimony would only be admissible where clear and convincing evidence of defendant's misconduct had been proffered. Rejecting the Federal "preponderance of the evidence" standard, the Court stated the clear and convincing standard was "more exacting" (id., at 367) and was "the test that best recognizes the gravity of the interest at stake and most effectively balances the need to reduce the risk of error against the practical difficulties of proving witness tampering" (id., at 367).
The Court also recognized that a finding of misconduct by the defendant would result in that defendant's forfeiture of the right to cross-examine the witness about the substance of the statements initially made by the witness. To even this limited and narrow abridgment of the right of confrontation, we stated:
"[A] defendant's loss of the valued Sixth Amendment confrontation right constitutes a substantial deprivation. Additionally, and even more significantly, society has a weighty investment in the outcome, `[b]ecause of the intimate association between the right to confrontation and the accuracy of the fact-finding process'" (id., at 367 [citation omitted]).
The Court's concern was obvious and manifest. By requiring the proffer of clear and convincing evidence, the Court sought to minimize the damage its rule could wreak upon "the process of determining the truth in adjudicative proceedings" (id., at 367). It is clear then that the Court's decision to limit the loss of the fundamental right of confrontation only to the substance of the hearsay statements is consistent with the tone, tenor and language of the decision, and its desire to protect and insure the integrity of the truth-seeking process (see, e.g., People v Maher, 89 N.Y.2d 456, 461 [rejecting the expansion of *83 the Geraci rule and recognizing "the weighty countervailing interests, that is, the constitutional right of confrontation and the strong New York policy for narrow treatment of exceptions to the hearsay rule"]).
The Federal rule adopted by the trial court was articulated in United States v Aguiar (975 F.2d 45). There, the defendant was arrested on drug charges with the assistance of George Albino, a courier. Approximately four months after defendant's arrest, and after Albino had entered into a plea agreement, Albino told the Government that he would no longer cooperate because he had been threatened by the defendant. Albino expressed fear for himself and his family. Pursuant to a search warrant, agents found two threatening letters in Albino's prison cell. One letter contained defendant's fingerprints and the other was from "a very good friend of [the defendant.]"
Faced with Albino's continued refusal to cooperate, the Government sought a hearing and attempted to introduce Albino's prior testimony inculpating the defendant (see, United States v Mastrangelo, 693 F.2d 269). The District Court admitted the testimony and held that defendant had procured Albino's unavailability and had thereby waived his confrontation rights and hearsay objections (United States v Aguiar, supra, at 47). The Second Circuit affirmed. It held that "although Mastrangelo involved sworn grand jury testimony, we did not there, and do not here, limit its rationale to such testimony. A defendant who procures a witness's absence waives the right of confrontation for all purposes with regard to that witness, not just to the admission of sworn hearsay statements" (id., at 47 [emphasis supplied]).
By comparison, in People v Geraci (supra), this Court held that "[a] determination that the defendant has procured a witness's unavailability results in the admission of hearsay statements and the forfeiture of the right to cross-examine about the substance of those statements" (id., at 367 [emphasis supplied]).
Yet, the trial court explicitly and inexplicably rejected this Court's rule. It stated that a recent articulation of State law should not be deemed authoritative and, instead, Federal law should supply the operative rule (see, United States v Aguiar, supra, at 47). In clear contravention of State decisional law, the trial court specifically stated:
"In this case, however, it would seem appropriate to follow the Federal rule, which holds that the defendant *84 who commits such misconduct forfeits his right of confrontation for all purposes as to that witness [citation omitted]. No-truth serving function will be served by allowing defendant to cross-examine Echevarria on any subject, under the circumstances here presented" (People v Cotto, 169 Misc 2d 194, 203, supra).
The majority has concluded that defense counsel's failure to object places the issue beyond our reach. It should be clear, however, that defense counsel did oppose the prosecutor's efforts to admit the out-of-court statements into evidence, arguing that the evidence that defendant threatened the witness was not clear and convincing and protesting the loss of the right of cross-examination. Thus, in accordance with CPL 470.05, defendant made clear what ruling was desired. In my view, no further objection was necessary, particularly when the court stated that it would not follow the rule of law announced by this Court.
There can be no doubt that the trial court's ruling deprived the defendant of his right of confrontation even more so than the Geraci rule envisioned or necessitated. Several reasons underscore the importance of cross-examination in this case. First, Echevarria was the only living witness against the defendant. The defendant's freedom rested upon the strength and weakness of this sole witness's testimony. The removal of defendant's right to confront this sole witness against him was a fatal blow to defendant's case. Second, a cross-examination of the witness could have brought forth the fact that the witness had a motive to support the People's view of the evidence. According to defense counsel, cross-examination as to the timing of Echevarria's statements inculpating the defendant would have revealed that these statements were made only during a period when Echevarria had a motive to fabricate. Specifically, the statements were made while there existed the possibility that cooperation with the People would speed his release from prison. Additionally, defense counsel argued that cross-examination could have revealed that the sole witness against the defendant was less than forthcoming on the stand in describing his prior offenses, and that in the witness's initial discussions with the police investigators, he did not name the defendant as the shooter. The relative merits of these arguments, and the weight, if any, to be accorded them, should have been questions for the jury to determine.

*85 B.
Contrary to the trial court's decision, there was no clear and convincing evidence that defendant engaged in misconduct so as to render the witness unavailable. While the majority relates the facts of this case to those in People v Geraci (supra), it is clear that there is a substantial difference between the two cases. First, a defendant will always be the greatest beneficiary where the primary and only witness against him refuses to testify against him. But unless there is clear and convincing evidence linking the defendant to the witness's subsequent refusal to testify, a defendant should not be penalized for the witness's action. It is possible, or even likely, that a witness in a criminal trial will come to realize, on his or her own, that testimony against the accused may put that witness or his or her family at risk of retaliation or retribution. Or it may be that the witness, becoming more and more aware of the risk of harm as the trial looms large, experiences an inchoate fear or senses danger lurking behind every gesture or word. In these circumstances, the witness will understandably seek to renege on his prior statements and may do so by stating that a threat has been made against the witness's safety or that of his or her family. But Geraci has made it clear that the focus of the court's inquiry should not be upon either the existence of a risk of harm or upon the perceived sincerity of the witness's, or his family's, fear. Rather, the critical gaze of the court must rest upon what role, if any, the defendant, or those acting on his behalf, played in bringing about the witness's unavailability. Without clear and convincing evidence of such interference, a defendant may not be held to have waived his constitutional right.
In Geraci, not only was the defendant out on bail, but he also approached the chief witness against him and stated that his lawyer wanted to discuss the case with the witness. Additionally, a known and identifiable individual  the defendant's uncle  spoke with the witness, and several thousand dollars was promised to the witness. In fact, at the time of the trial, the witness had already received $2,000 and was to receive $250 per week until the end of the trial.
In the instant case, the witness, Echevarria, claimed that "someone" had approached his mother and sister and inquired as to his whereabouts. He also stated that "there would probably be a contract" out on him. Echevarria's sister claimed that "unidentified people" from the neighborhood had approached *86 her and asked where he was being housed at Rikers Island. These same "unidentified individuals" also allegedly expressed dismay that he was going to testify. Echevarria's sister stated that the "word on the street" was that Echevarria was "talking." Additionally, his sister stated that she knew that defendant's family had "killed a family a while ago." Next, Echevarria's mother stated that while no one in the community had uttered a single word to her, her daughter had related to her the story of being approached by one or more unidentified individuals questioning the whereabouts of the witness.
This is the sum and substance of the evidence of defendant's alleged threats causing the witness's unavailability. Such "proofs" simply do not rise to the level of clear and convincing evidence. There is no proof that a "contract" existed on the witness. There is no proof that the defendant or anyone acting on his behalf ever spoke to the witness's sister. Although defendant was out on bail, there is no proof that he or anyone associated with him made any contact with the witness (see, People v Hamilton, 70 N.Y.2d 987, 988). Instead, the People proffer, as evidence of a threat, the statement of Echevarria, the witness, that the defendant, at the time of the shooting, looked Echevarria in the eye and pointed a gun at him. However, even assuming this statement to be true, and the incident did occur on November 28, 1992, the incident appears to be of little relevance since Echevarria went on to identify the defendant on two separate occasions  March 13 and March 14, 1996. Thus, this alleged incident, occurring almost four years before Echevarria first identified the defendant, then withdrew his identification, can hardly be the threat which caused the defendant's unavailability.
Most troubling is the precedent being set by this Court in sustaining the trial court's ruling. Under the authority of this case, vague allegations of "word on the street" combined with tales of unsubstantiated visits by unnamed individuals will suffice to establish clear and convincing evidence of a defendant's unlawful interference with a witness. Such a conclusion could not have been intended by this Court when it reasoned that "our statutory and decisional law counsels a cautious approach that permits use of the exception only when the predicate facts are proven with the degree of certainty that the `clear and convincing evidence' test assures" (People v Geraci, 85 N.Y.2d 359, 368-369, supra). The truth-seeking and truth-protecting aspects of the "clear and convincing" standard are not preserved by an affirmance in this case.

*87 C.
Although the court held that the victim's statements could not be admitted into evidence as dying declarations, the court erred in admitting the statements as excited utterances. It has been clearly established that an out-of-court statement may be introduced for the truth of its content if the statement is made "before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance" (People v Marks, 6 N.Y.2d 67, 72). The linchpin of an excited utterance is that
"`under certain circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control * * *. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts'" (id., at 71-72).
Moreover, "[w]hile the statement must have been made before the declarant had the opportunity to reflect, `"the time for reflection is not measured in minutes or seconds,"' but rather `"is measured by facts"'" (People v Vasquez, 88 N.Y.2d 561, 579). Before admitting a statement as an excited utterance, the trial court must
"`assess not only the nature of the startling event and the amount of time which has elapsed between the occurrence and the statement, but also the activities of the declarant in the interim to ascertain if there was significant opportunity to deviate from the truth. Above all, the decisive factor is whether the surrounding circumstances reasonably justify the conclusion that the remarks were not made under the impetus of studied reflection'" (People v Brown, 70 N.Y.2d 513, 519 [citation omitted] [emphasis in the original]).
The facts of this case show that the victim, Steven Davilla, was found lying in the street at 103d Street and Second Avenue *88 by two officers. Though no blood was visible, it was believed that Davilla had sustained a gunshot wound to the abdomen or chest, and the officers summoned an ambulance. When the ambulance arrived, Davilla, who was conscious and lucid, was placed on a gurney and into the ambulance. An officer rode along with the victim. As the ambulance sped away, the officer asked Davilla, "Who shot you?" Davilla responded by tapping his own chest and saying, "I know." Believing that Davilla did not want to speak with the officer, the emergency medical technician on board told Davilla, "You're not doing too good. Why don't you talk to the officer." The officer reiterated this assertion.
At this point, Davilla began to cooperate and gave the officer his name, address and apartment number. The officer then asked, "Who shot you?" and Davilla replied, "Richie." The officer asked for "Richie's" last name, but Davilla did not answer. So the officer again stated, "Do you realize that there's a good chance you're going to die?" Davilla responded, "Yeah." After some period of time  perhaps seconds, perhaps minutes  Davilla stated that the shooter was "Richie from my building." The officer asked whether the shooter was named "Richard Cotto," and Davilla responded affirmatively and added that it was "Richie from the fourth floor." At this point in time, the officer again asked, "Do you realize that there's a chance you're going to die?" and Davilla again responded affirmatively. The officer then asked, "Are you sure who shot you?" and Davilla responded, "Yeah" and  seconds or minutes later  added, "Richie Cotto shot me." At this time, according to the testimony of the officer, Davilla became somewhat ashen and began to experience some difficulty breathing. But the officer was able to ask, "What kind of car does he drive, because I want to make sure we're talking about the same person here. What kind of car does he drive?" And Davilla was able to respond that it was a white car.
It is difficult to conclude from this recitation of the facts that the victim's statements constituted an excited utterance. It is evident that the witness listened to the multiple questions and proddings of both officer and technician, reflected upon his answers, deliberated before responding, and weighed his responses accordingly. A statement or utterance made in response to an inquiry is merely one factor bearing on spontaneity (see, People v Edwards, 47 N.Y.2d 493, 498; People v Brown, 70 N.Y.2d 513, 522, supra [the "nature, extent and purpose of the questions and the identity, position and manner of the *89 questioner" are additional factors to be considered]). However, the facts of this case demonstrate that the officer was engaged in a conversation with the witness and was clearly attempting to prod loose from the witness the name of his attacker.
The facts show that the witness at first affirmatively declined to name his attacker. There was no evidence that this reluctance was occasioned by his medical condition rather than his own cognitive function or decision-making process. But after continuous prompting by the medical technician and police officer, the witness offered a first name. And again, after gentle and helpful reminders of his imminent demise, the witness agreed that his attacker was the defendant. In fact, the medical technician's own observations and testimony support the view that Davilla clearly reflected upon his statements before responding to the officer's inquiries. When asked during cross-examination whether it was the patient or the officer who first named the defendant, the medical technician stated:
"The patient [said] `Richie.' He didn't say it right away. He sort of like thought about it for a few seconds and then he said `Richie'."
The safeguards or indicia of reliability which form the core of this hearsay exception are greatly attenuated in this case. There is no doubt that a gunshot wound constitutes an "external startling event" (People v Edwards, 47 N.Y.2d 493, 497, supra) which may precipitate an excited utterance. However, there is no presumption that a statement attendant to the infliction of such a wound will in all cases constitute an excited utterance. The circumstances of each case and the behavior of each witness must be carefully examined (see, People v Brown, supra, at 522 ["The focus of the inquiry remains the same: the physical, psychological, and emotional condition of the declarant and whether it can be reasonably concluded `that the remarks were not made under the impetus of studied reflection'."]). Here, there was no evidence of the "extreme pain and unrelenting physical and emotional trauma" that this Court found dispositive in People v Brown (supra, at 520). In fact, neither the officer nor the medical technician testified that the victim himself expressed any sense of urgency or fear during the questioning, or that he appeared to be excited or under stress when he spoke (see, People v Nieves, 67 N.Y.2d 125, 135). As previously stated, the witness was conscious and lucid throughout the majority of the questioning. The deliberative and reflective nature of Davilla's statements *90 in response to questions by the officer and medical technician is striking and should have served to remove the statements from the realm of the excited utterance exception.
Also relevant here are the allegations of a long-standing feud or enmity between Davilla and the defendant and the fact that the witness died before trial and thus could not be subject to cross-examination (see, 6 Frumer and Biskind, Bender's New York Evidence  CPLR § 24.03 [1], at 24-6 [stating that factors that must be taken into account in determining whether a declaration was an excited utterance include "the fact that the complainant was subject to cross-examination"]).
Thus, I conclude that the trial court's failure to follow State decisional law which caused defendant to be deprived of his constitutional right of confrontation provides sufficient ground upon which to reverse the order of the Appellate Division. Additionally, there was no clear and convincing evidence of defendant's misconduct. Finally, the trial court erred when it admitted into evidence the testimony of the victim as an excited utterance.
Accordingly, I would reverse the order of the Appellate Division and order a new trial.
Order affirmed.
NOTES
[1] Contrary to the dissent, the Court is not setting a new standard by accepting "unsubstantiated visits by unnamed individuals" (dissenting opn, at 86). Here, unlike People v Hamilton (70 N.Y.2d 987), there was well-established motive, opportunity, timing and prior intimidation to link defendant to the threats. Requiring specific identification in situations invariably involving surreptitious conduct permits easy evasion of the principle, and sound public policy, that defendants should neither interfere with witnesses nor benefit from such wrongful conduct.
[2] While we cannot reach the merits of the unpreserved issue and decide the permissible scope of cross-examination, we cannot let stand the suggestion of the dissent that the trial court "explicitly and inexplicably" rejected a rule of law announced by this Court (see, dissenting opn, at 80, 83). The trial court stated that no "truth-serving function will be served by allowing defendant to cross-examine Echevarria on any subject, under the circumstances here presented" (People v Cotto, 169 Misc 2d 194, 203 [emphasis supplied]).
[3] While we agree with the dissent that the passage of time is not, in itself, dispositive, the dissent nonetheless implies that the victim spent substantial time being questioned in the ambulance, affording him an opportunity to reflect. To the contrary, the trip from the site of the shooting to the hospital took less than 10 minutes, and the entire exchange between the victim and the police officer took approximately two minutes.